# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:09-CR-361-RWS/AJB** |
| **JIMMY JOHN SILVA (#9),** | ) | |
| | ) | **(Superseding)** |
| **Defendant.** | ) | |

## ORDER FOR SERVICE OF
## REPORT AND RECOMMENDATION

Attached is the Report and Recommendation ("R&R") of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. CrR. 58.1(A)(3)(a), (b).  A copy of the R&R and this order shall be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the R&R within **fourteen (14)** days of service of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990).  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  If no objections are filed, the

R&R may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay*, 714 F.2d 1093 (11th Cir. 1983).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.** If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge. 18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986); *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983). The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  1st  day of  November  , 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:09-CR-361-RWS/AJB** |
| **JIMMY JOHN SILVA (#9),** | ) | |
| | ) | **(Superseding)** |
| Defendant. | ) | |

**UNITED STATES MAGISTRATE JUDGE'S**
**FINAL REPORT AND RECOMMENDATION**

Jimmy John Silva is named in the above-numbered superseding indictment as a participant in a drug conspiracy.  [Doc. 82].  He seeks to suppress from his trial his statement to Gwinnett County Police Sergeant James Price to the effect that he admitted that his voice was recorded by the government during some intercepted telephone calls.

 [Doc. 244].  Regardless of the strength of the rest of the government's case against Silva, the undersigned **RECOMMENDS** that the government should not have the benefit of that statement to use in its case-in-chief at trial since it was obtained in violation of Silva's Sixth Amendment right to counsel.  As a result, the undersigned **RECOMMENDS** that Silva's motion, [Doc. 244], be **GRANTED**.

### *Introduction*

On July 29, 2009, a grand jury in this District returned a multiple-count indictment against Silva (identified as "John Doe a/k/a Jimmy a/k/a Loco") and others, [Doc. 1]. Silva is currently charged in a superseding indictment with conspiring with others to possess with intent to distribute cocaine. [Doc. 82, Count One].[1] Following his arraignment, he filed a motion to suppress statements. [Doc. 244]. The Court conducted an evidentiary hearing, [Doc. 280, hereinafter "T__"], after which the parties filed briefs. [Doc. 284 (Silva); Doc. 286 (Govt.)]. Silva did not file a reply to the government's brief. [*See* Dkt.].

### *Facts*

The facts are relatively undisputed. Sergeant Price is a 21-year veteran of the Gwinnett County Police Department. T6. He previously headed the department's drug interdiction unit. T26. Since 2008, he also moonlights as the security officer for the homeowners' association in the subdivision were Silva lives. T7. He works at the subdivision a maximum of five hours per week, during which he patrols the neighborhood, makes contact with the residents and addresses any security concerns they have. T7-8.

---

[1]     The superseding indictment was returned August 25, 2009. [Doc. 82].

2

Before August 5, 2009, Price knew Silva by face as a resident of the neighborhood.  T8.  Also, one time before that date, Price observed Silva riding neighborhood children in a dune buggy on the neighborhood streets and the main road outside of the subdivision.  After Price received complaints from neighbors, Price blue-lighted Silva and told him to stop.  T8-9.

In August 2009, Price was asked by DEA Agent Blevins to assist federal agents in the search of a residence on Bee Blossom Road, which resulted in the seizure of multiple kilos of cocaine.  Price then was told that a federal arrest warrant had issued for Silva, and Price along with other law enforcement officers were directed to an apartment complex on Boggs Road, where the officers located several men.  When Price asked the men who was Jimmy Silva, Defendant replied.  Price then recognized him as a resident of the neighborhood that he patrolled.  He placed Silva under arrest. While transporting Silva to the Bee Blossom location, Price stated to Silva that having to arrest him was not related to Price's role as a moonlighting officer in the neighborhood, but that he was just doing his job in assisting the federal agents.  Silva replied that he understood.  T12-14, 30-31.  Price testified he called Blevins in order to find out from him whether he had to be concerned about any ongoing drug activity in the neighborhood Price patrolled, since a defendant who was arrested in a major

3

federal case lived there.  Blevins replied that he should not be worried.  T35.  Although Price had other cases with the DEA after the date of Silva's arrest, Price was not involved in the federal investigation involving Silva and did not have any contact with Silva again until February 12, 2010.[2]  T20, 32.

On that date, Price was in his police uniform and parked in his marked police pickup truck on one of the main roads leading into Silva's subdivision, at the top of the cul de sac where Silva's house was located.  T10, 26-27.  He was parked at the only exit/entry point of the neighborhood, but he was not blocking traffic.  T11-12, 28-29. It was towards the end of his 5:00 to 7:30 p.m. shift.  T15-16.  It was snowing, and Price was watching a movie on his laptop computer when he noticed a pair of headlights coming up to his side of the vehicle.  T15-16.  He recognized the white Lincoln Navigator as a vehicle always at Silva's house.  Silva stopped this vehicle parallel to Price's, and opened his driver's side window.  Price did the same in response.  T16.  The ensuing conversation was in a friendly tone.  T21.  Silva placed

---

[2]      Price had a conversation with Silva's father, Pablo Silva, in the fall of 2009.  Price had not seen Silva's father before, so when he saw him standing in the neighborhood, he stopped and spoke with him, and learned that the senior Silva was an electrical and plumbing contractor.  T19-20.  However, Price also had a heightened awareness because a defendant in a major drug case was living in the neighborhood and wanted to make sure that Silva's family was safe.  T36.

4

his vehicle in "park," and it appeared to Price that Silva wanted to talk to him.   T21.

Price testified that the following took place after he and Silva exchanged greetings and

talked about the snow:

> Again, I was really surprised because I thought he was -- he would still be locked up.  I didn't -- you know, figured cocaine case, he was in jail.  I didn't know.  And so we got to talking, and I believe at one point -- I'm trying to remember the way the conversation went.  It was, you know, I guess you got out.  And he goes, yeah, they gave me a bond. *And I said, well, what's going on with your case?  And he goes – oh, he said, I -- they got some phone calls or something.*  And I don't think they have anything on me.  But my -- you know, said don't worry about it.  And I go, well, what did they charge you with?  I said, you know, all I did was locked [*sic*] you up.  I didn't know what they even charged with.  And he was, like, it's a conspiracy -- I said, conspiracy?  And he goes, yeah.  And I said, was -- what else?  And he goes, cocaine.  I said, conspiracy, traffic cocaine?  He goes, yes.  Okay.  And so, got off of that conversation.  Just, you know, you doing all right, everything okay.  You know, I mentioned to him that I had met his dad, because I had met his dad in the cul-de-sac one day.  And I said, you know, I told him -- I said, hey, I'm out here.  If you ever need anything, yell at me.  I'm always up here.  And at one point I said, Jimmy, I said -- *I said, after we made the arrest, I said, one of our gang guys said something to me that they knew you and asked me what had happened.  And I said, really, I said, it was a D.E.A. case.  I said, we made the arrest on him.  And they said, yeah, we had some run-ins with him in the past.  He seemed like a -- you know, he's in some minor stuff.  He seemed like an all right guy.  And I said, you know, you ever thought about working for the police and, you know, talking to us?  And he goes, you mean talking to you guys?  And I go, well, yes.  And, you know, I said, you know a lot of people.  You might -- you know, you seem to be involved in a lot of things.  I said, you might have some valuable stuff for us.  And I said, have you ever thought about it?  And he goes, you know, and just kind of hee-hawed around with it.  And he said, well, would I work for*

5

> *you? And I said, no, I don't do that kind of thing. I would set you up with someone else in our investigations. And he goes, well, would it be with Gwinnett or, you know, the Feds? And I said, well, I said, honestly we'd love to have you if you've got stuff to offer. I said, but you got a pending Fed case. I said, you might ought to talk to them. And I said, I personally know one of the agents. I said, I'd be happy to put you in touch with him if you want to. And I said, you know, you know where I'm at. I'm here all the time. Just yell at me. He said, oh, you know -- he says, let me think about it.* I said, all right. And I think it was, see you later, good-bye, or something, and that was the end of the conversations.

T17-19 (emphasis supplied); *see also* T37. Also, towards the conclusion of their encounter, Price told Silva that his paper license plate was expired. Silva explained that he was having trouble getting the title from the seller and was currently in court over it. T21. The entire encounter lasted between seven and ten minutes. T19.

No one directly involved in the federal prosecution had directed Price to attempt to interview Silva. T24. However, the first thing Price did when Silva left was to call Special Agent Blevins and report to him his conversation with Silva. T23. Prior to the encounter with Silva, Price had no reason to believe that the case had been resolved. T39.

At no time during the encounter did Price raise his voice, advise Silva he was under arrest, exit his vehicle or turn on his emergency lights. T22-23.

6

### Contentions of the Parties

In his initial motion, Silva contended that his statements were subject to suppression from his trial because they were obtained in violation of the Sixth Amendment generally, were not voluntary and contrary to *Miranda v. Arizona*, 384 U.S. 436, 468-69 (1966).  [Doc. 244].  In his post-evidentiary hearing brief, Silva does not argue either that the statements were involuntary or obtained in violation of *Miranda*, [*see generally* Doc. 284], so the Court considers those grounds abandoned.  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (holding that issues or arguments not raised in a party's brief are abandoned).[3]  In his post-

---

[3]     To the extent that the District Court disagrees that Silva abandoned his involuntariness and *Miranda* contentions, in the alternative, the Court **RECOMMENDS** that these two arguments be **DENIED ON THEIR MERITS**.  First, the Due Process Clause of the Fifth Amendment prohibits use of involuntary confessions at a criminal trial.  *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005); *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988).  The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement.  *Thompson*, 422 F.3d at 1295.  "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."  *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted).  The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession.  *Miller*, 838 F.2d at 1536.  This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice."  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the

7

use of any physical force against him, or the use of any promises or inducements by police. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

As none of the factors in this case point towards a finding of involuntariness, the Court concludes Silva's statement to Price was voluntary. Although the record is silent as to Silva's intelligence, he was not detained or under arrest, in that he stopped his vehicle voluntarily, and Price did not exit his police vehicle, advise Silva he was under arrest, or otherwise limit Silva's ability to leave. Obviously, because Silva was not detained, the length of his detention is a non-factor. As to the nature of the interrogation, the encounter was initiated by Silva. Price's question about the status of his case was not accusatory, nor did he seek additional details about Silva's involvement. Although he tried to get Silva to cooperate with either the state or federal authorities, none of the language Price used conveyed any coercion or threats. Further, Price did not use any physical force against him. Finally, other than stating he would put in a good word with Special Agent Blevins if Silva wanted to cooperate, he did not make any promises or otherwise offer any inducements to Silva. Also, the offer to put in a good word for Silva occurred after Silva made the allegedly incriminating admission about being on the recordings. Therefore, his statement was voluntarily obtained.

As to *Miranda*, Silva has the burden to demonstrate that he was in custody and

evidentiary hearing brief, Silva contends that his statements to Price were obtained in derogation of his Sixth Amendment right to counsel under *Massiah v. United States*, 377 U.S. 201 (1964), and *Brewer v. Williams*, 430 U.S. 387 (1977), and must be excluded from his trial.  [Doc. 284 at 4].  He argues that after indictment, government agents are prohibited from deliberately eliciting incriminating statements from the accused in the absence of counsel.  [*Id.*].  Although recognizing that suppression is not mandated if the government obtains statements by luck or happenstance, Silva nonetheless argues that to determine if law enforcement's actions are reasonably likely

---

subjected to custodial interrogation before his rights under *Miranda* are triggered.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988).  A person is in custody for purposes of *Miranda* where "a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."  *United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2006) (emphasis supplied); *see also United States v. Phillips*, 812 F.2d 1355, 1359 (11th Cir. 1987) ("[T]he ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.' ") (quoting *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984)).  In this case, there are no facts which demonstrate that Silva had a restraint on his freedom of movement of a degree associated with a formal arrest.  He voluntarily stopped to speak with Price, even turning off his engine.  Prince did not physically touch Silva or direct him to remain at their location.  Thus, Silva was not in custody for *Miranda* purposes, and as a result, the Court need not discuss whether he was subjected to interrogation.

9

to prompt an incriminating response, the focus is upon the suspect's perceptions, not those of the police.  [*Id.* at 5].

Silva next contends that Price was an agent of the federal government when he asked Silva about his case.  He argues that although Price was acting as a privately-paid security guard at the time of the encounter, he still was a police officer, dressed in his official Gwinnett County Police Department uniform, armed with his officially-issued weapon and driving a Gwinnett County Police Department vehicle.  Moreover, he previously acted upon the DEA's orders in arresting Silva.  [*Id.* at 6].  He also argues that Price deliberately elicited incriminating statements from Silva when he (1) asked about the status of Silva's case; (2) then attempted to "manipulate [him] into cooperating with the police by associating him with a known gang member," [*id.* (citations to record omitted)]; and (3) suggested that Silva should cooperate because he was involved in a lot of things  [*Id.* (citations to record omitted)].  He argues that since Price, a government agent, deliberately elicited statements from Silva following his indictment and in the absence of counsel, any such statements must be suppressed from his trial.  [*Id.* at 7].

In response, the government acknowledges that it was unable to locate any cases directly on point to the current controversy.  It also recognizes the unusual factual

10

scenario presented in this case. Nonetheless, the government contends that to the extent the analysis to be employed is derived from the *Massiah* line of cases, suppression of Silva's statements to Price is not mandated. [Doc. 286 at 7]. It argues that at the time of Silva's statement to Price, Price was not acting as an agent of the government, nor did he "deliberately elicit" Silva's statements, as that term is used in the *Massiah* context. [*Id*. at 7-8]. In support of its lack-of-agency argument, the government contends that, other than arresting Silva at the request of federal agents, Price had no involvement in the investigation or prosecution of Silva. It further contends that Price had no stake in the case, did not read any reports or have any discussions with federal agents about it, nor did he even know that Silva's case still was pending. [*Id.* at 9]. It also points out that no one from the DEA requested Price to patrol Silva's neighborhood, approach Silva, or ask him any questions. The government further argues there is no evidence that there was a joint federal-state investigation of Silva or his codefendants or that Price had authority from the DEA to speak with Silva. It submits that Price simply was performing his moonlighting job when Silva approached him. Therefore, it concludes Price was not acting as a government agent for purposes of *Massiah*. [*Id.*].

11

The government also contends that, even if Price is found to be a government agent for *Massiah* purposes, suppression of Silva's statements are not warranted because Price did not deliberately elicit any statement from Silva. It argues that Silva has not met his burden to demonstrate that Price's question, "[w]hat's going on with your case?," amounted to any "deliberate eliciting" of incriminating statements from him. [*Id.* at 10]. In support, it contends that the cases look to the intent of the police in determining whether the officer deliberately elicited a statement from a defendant. The government argues that Price did not deliberately elicit the statement from Silva, because Silva initiated the contact with Price, and the nature of the question ("what's going on with your case?") was not a deliberate attempt to obtain an incriminating statement but rather an inquiry to see if the case was still ongoing or had been resolved. [*Id.* at 11-12]. The government further supports this argument with its contention that Price was unaware of the status of Silva's federal case, and there is no evidence that federal agents asked Price to elicit information from Silva. [*Id.* at 11]. The government also argues that if Price had sought to deliberately elicit incriminating information from Silva, he would have asked additional questions, such as "what is your defense?" [*Id.*]. It further argues that Price also might have asked follow-up questions as to the number of telephone calls Silva was on or to whom he was speaking,

12

and the fact that he did not demonstrates Price's lack of intention to deliberately elicit incriminating information from Silva. [*Id.*].

### *Discussion*

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. "The Sixth Amendment right to counsel is triggered 'at or after the time that judicial proceedings have been initiated . . . whether by way of formal charge, preliminary hearing, indictment, information or arraignment.' " *Fellers v. United States*, 540 U.S. 519, 523 (2004) (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977), and *Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (internal quotation marks altered)); *see also Kansas v. Ventris*, 129 S. Ct. 1841, 1845 (2009) ("We have held, however, that the right extends to having counsel present at various pretrial "critical" interactions between the defendant and the State . . . including the deliberate elicitation by *law enforcement officers* (and their agents) of statements pertaining to the charge. . . .") (citations omitted) (emphasis supplied); *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (noting that right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings" (citations omitted)); *Patterson v. Illinois*, 487 U.S. 285, 290 (1988) (recognizing that criminal defendant has "right to

13

have the assistance of counsel at his postindictment interviews with law enforcement authorities").  The Supreme Court has held that

> the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself.  Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, we have found that the right attaches at earlier, "critical" stages in the criminal justice process where the results might well settle the accused's fate and reduce the trial itself to a mere formality.

*Maine v. Moulton*,  474 U.S. 159, 170 (1985) (citations and internal quotation marks omitted).

So, once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him.  *Brewer*, 430 U.S. at 401 (footnote omitted); *see also United States v. Terzado-Madruga*, 897 F.2d 1099, 1109 (11th Cir. 1990) ("Once the right to counsel has attached, the government is under an 'affirmative obligation' to respect and preserve the accused's choice to seek this assistance, and the law enforcement authorities must take no action that 'circumvents, and thereby dilutes the protection afforded by the right to counsel.' ") (quoting *Moulton*, 474 U.S. at 171).  As a result, the Sixth Amendment prohibits the admission of statements deliberately elicited by the government from the defendant after adversary criminal proceedings have begun, unless the defendant's

14

counsel is present or the defendant waives his right to counsel. *United States v. Laster*, 184 Fed. Appx. 859, 862 (11th Cir. 2006) (citing *Massiah* and *United States v. Gunn*, 369 F.3d 1229, 1237 (11th Cir. 2004)); *see also United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1215-16 (11th Cir. 2009) ("[A]n accused is denied 'the basic protections' of the Sixth Amendment' when there is used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel.' ") (quoting *Fellers*, 540 U.S. at 523, and *Massiah*, 377 U.S. at 206). The penalty for violation of this Sixth Amendment right is suppression of the accused's incriminating statements. *Id.* (citing *McNeil*, 501 U.S. at 179).

Silva has the burden of establishing a violation of this Sixth Amendment right to counsel. *Lightbourne v. Dugger*, 829 F.2d 1012, 1020 (11th Cir. 1987); *see also United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998); *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980); *United States v. Lentz,* 419 F. Supp. 2d 794, 800 n.8 (E.D. Va. 2005). *Cf. United States v. Henry*, 447 U.S. 264, 277 (1980) (Powell, J., concurring) ("To demonstrate an infringement of the Sixth Amendment, a defendant must show that the government engaged in conduct that . . . is the functional equivalent of interrogation."); *Kuhlmann v. Wilson*, 477 U.S. 436, 463, 469 (1986) ("[T]he

15

defendant must demonstrate that the police and their informant took some action . . . that was designed deliberately to elicit incriminating remarks."). To establish a violation of a defendant's right to counsel for uncounseled statements following indictment, a person must both "deliberately elicit" the incriminating information from the defendant and must do so while acting on behalf of the State as a government agent, such as a police officer or an individual acting as an informant for the police. *See Black v. Kirkland*, No. CV 05-7139 GW (FFM), 2009 WL 1971596, *9 (C.D. Cal. July 8, 2009) (citing *Massiah*, 377 U.S. at 206-07; *Kuhlmann*, 477 U.S. at 459-61 (Sixth Amendment does not forbid admission of an accused's statements even to a jailhouse informant placed in close proximity to accused but who made no effort to stimulate conversation about the pending criminal charges; "defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks"); *Randolph v. California*, 380 F.3d 1133, 1144, 1146-47 (9th Cir. 2004)).

Silva has satisfied his burden as to both elements of a violation of his Sixth Amendment right to counsel. At the outset, the Court notes that the parties have spent a lot of effort arguing whether Price was a "government agent" under the *Massiah* line of cases. They did so probably because the Court remarked at the end of the

16

evidentiary hearing that this case was controlled by *Massiah*.  T53-56.  The Court's

reference to *Massiah*, however, was to point out that this case concerned non-custodial,

post-indictment and uncounseled statements, as opposed to Silva's initial claim that the

statements were in violation of his Fifth Amendment *Miranda* rights.  It is true that the

cases typically discuss post-indictment statements in the context similar to *Massiah*,

i.e., whether the informant or co-defendant was an agent of the government, where the

inmate or the co-defendant must be "a Government agent expressly commissioned to

secure evidence."  *Henry*, 447 U.S. at 273;  *Depree v. Thomas*, 946 F.2d 784, 793-94

(11th Cir. 1991) (in analyzing whether informant is government agent, "[t]here is, by

necessity, no bright-line rule for determining whether an individual is a government

agent for purposes of the sixth amendment right to counsel.  The answer depends on the

'facts and circumstances' of each case.") (citation omitted); *see also Ayers v. Hudson*,

--- F.3d ----, ----,  2010 WL 3894463, *8 (6th Cir. Oct 5, 2010) (dictating that a court

must also analyze the facts and circumstances of a particular case to determine whether

there exists an express or implied agreement between the State and the informant at the

time the elicitation took place that supports a finding of agency).

However, as shown in the text above, the Sixth Amendment prohibits all

deliberate law enforcement questioning of a defendant after the right to counsel

AO 72A
(Rev.8/8
2)

attaches, unless counsel is present or a proper waiver of the right to counsel is secured. *Ventris*, 129 S. Ct. at 1845, 1846 ("Simply put, the constitutional violation occurs when the uncounseled interrogation is conducted."); *Brewer*, 430 U.S. at 400-01 (same, and noting also that the fact "[t]hat the incriminating statements were elicited surreptitiously in the *Massiah* case, and otherwise here, is constitutionally irrelevant"); *Lightbourne*, 829 F.2d at 1019-20 ("[T]he Sixth Amendment prohibits law enforcement officers from deliberately eliciting incriminating information from a defendant in the absence of counsel after a formal charge against the defendant has been filed."); *see also Ayers*, 2010 WL 3894463 at *6; *Manning v. Bowersox*, 310 F.3d 571, 575 (8th Cir. 2002) (holding that "the right to counsel applies not only to direct confrontations by known government officers, but also to indirect and surreptitious interrogations by covert government agents and informants") (internal quotation marks deleted).  The purpose behind the analysis is to prevent the government from doing indirectly what it cannot do directly - - deliberately elicit incriminating statements from the defendant after his right to counsel has attached.  *Ayers*, 2010 WL 3894463 at *8 (holding that a tacit agreement with an informant may be sufficient to establish agency because "[t]o hold otherwise would allow the State to accomplish 'with a wink and a nod' what it cannot do overtly.  This, the Sixth Amendment does not permit.").

18

The Court recognizes that the DEA did not seek Price's assistance in obtaining incriminating statements from Silva on February 12, 2010, or otherwise have any arrangement with him before his encounter with Silva. But those are facts which are relevant only where the person obtaining a statement from a defendant following the start of adversary proceedings is either an informant or, as discussed below, a law enforcement officer not acting in her official capacity.

The issue then is not whether Price was an agent of the federal prosecution team, but whether he was acting in a law enforcement capacity when he had his encounter with Silva. That is, the Court must determine if Price was acting as a law enforcement officer or as a private citizen when he had the encounter with Silva.

The facts of this case demonstrate that Sgt. Price was acting as a law enforcement officer when he spoke with Silva. Whether Silva's statements to Price are subject to suppression is an issue of federal law, *Elkins v. United States*, 364 U.S. 206, 223-24 (1960), but the Court is of the opinion that to determine whether Price was acting as a law enforcement officer or a private security officer is, at least partially, governed by state law. *Cf. McMillan v. Monroe County,* Ala., 520 U.S. 781, 785-86 (1997) (recognizing that in determining whether an official is a state or county official for

19

*Monell*[4] liability for purposes of 42 U.S.C. § 1983, federal court looks to state law because "the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law").

The Georgia Court of Appeals in *Stryker v. State*, 297 Ga. App. 493, 494, 677 S.E.2d 680, 681-82 (2009), considered a case where the defendant was arrested for obstructing a uniformed police officer who was working an approved off-duty job at a package store. In rejecting his claim that he could not be convicted under state law for obstructing an officer because the officer was off-duty, the *Stryker* Court summarized the controlling principles of Georgia law, as follows:

> [T]his Court has recognized that "all law enforcement officers have the general duty to enforce the law and maintain the peace. They carry this duty twenty-four hours a day, on and off duty." *Duncan v. State*, 163 Ga. App. 148(1), 294 S.E.2d 365 (1982).[5] Because [the officer] was

---

[4]     *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[5]     In *Duncan*, a case involving an off-duty police officer working as a security guard in a bar, the court observed:

> The practice of municipalities which allows law enforcement officers to serve, while off duty and in uniform, as peace-keepers in private establishments open to the general public is in the public interest. The presence of uniformed officers in places susceptible to breaches of the peace deters unlawful acts and conduct by patrons in those places. The

20

off-duty, however, the question arises whether he "was acting solely in his capacity as an employee of the [store] or in his official capacity as a peace officer, executing his duty to uphold the criminal law and to prevent a breach of the peace, when he . . . arrested [the defendant]."   (citation omitted.) *Helton v. State*, 284 Ga. App. 777, 778-779(1), 644 S.E.2d 896 (2007). Although [the officer] was on the premises in his capacity as an employee, he was acting in the exercise of his official duties when he detained [the defendant's girlfriend] on suspicion of shoplifting and assisted the on-duty officers in the investigation of that crime. *See Carr v. State*, 176 Ga. App. 113, 114-115(1), 335 S.E.2d 622 (1985); *Whaley v. State*, 175 Ga. App. 493, 494, 333 S.E.2d 691 (1985) (off-duty officer who assists on-duty officers in effecting an arrest acted in the discharge of his lawful duty).

*Stryker*, *id.*

The facts of the present case demonstrate that Price was acting in his capacity as a law enforcement officer during his encounter with Silva.  First, he was dressed and armed as a law enforcement officer and was operating a law enforcement vehicle.  His knowledge of Silva's case stemmed from his duties as a law enforcement officer, and not from his moonlighting security position.  In fact, when he arrested Silva in August

------

public knows the uniform and the badge stand for the authority of the government.  The public generally knows that law enforcement officers have the duty to serve and protect them at all times.  A holding that law enforcement officers have no official duty to maintain the peace under these circumstances would be in contravention of the policy we seek to further.  Therefore, we refuse to adopt the limited interpretation of the term "official duties" espoused by appellant.

*Duncan*, 163 Ga. App. at 149, 294 S.E.2d at 366-67.

21

2009, Price expressly told Silva that the action undertaken by Price that day had noting to do with his role as a security officer.  T32.  On the date of the encounter with Silva in the subdivision, after asking about the status of Silva's case, he disclosed facts about his contact with gang members to Silva which he (Price) learned as a law enforcement officer, and he then attempted to convince Silva to cooperate with either local or federal law enforcement officers.  Finally, at the end of the encounter, Price told Silva that his vehicle tag was not in compliance with state law.  As a result, in addition to Price's general duty as a law enforcement officers to enforce the law and maintain the peace "twenty-four hours a day, on and off duty," these facts demonstrate that Price was acting as a law enforcement officer for purposes of deciding whether post-indictment questioning violates the Sixth Amendment's right to counsel guarantee.

The facts of this case are different from *United States v. Gaddy*, 894 F.2d 1307, 1311-13 (11th Cir. 1990), where the court concluded that the defendant's aunt was not acting as a police officer when she convinced the defendant to make a statement, and therefore no Sixth Amendment violation occurred.[6]  The court reasoned that although

---

[6]     Another case which arguably is relevant, *Endress v. Dugger*, 880 F.2d 1244 (11th Cir. 1989), is on closer look not instructive.  Although a detective who was a friend of the defendant testified at the defendant's trial as to statements made to him by the defendant, and the court noted that in visiting the defendant in jail the detective was acting as a fried and not as a law enforcement officer, the case turned not on the

22

the aunt was a police officer, she was an evidence technician and her duties were not investigative in nature. Even though there was evidence that the detective investigating the crimes (along with the FBI) for which the defendant was arrested told the aunt that it would be in the defendant's benefit to cooperate, the lower courts found and the Eleventh Circuit held that she contacted her nephew on her own accord out of concern for her nephew if he did not give a statement before the codefendant talked, and not at the direction of a supervisor nor for the benefit of the police department. After meeting with the aunt, the defendant agreed to give a statement and the aunt notified the investigators, who *Mirandized* the defendant and took a statement. The aunt made no written report following her communication with the defendant, as was customary if she had been acting in an official capacity.

As opposed to *Gaddy*, the following facts establish that Price was acting in his official capacity during his encounter with Silva on February 12 for the following reasons:

(1) At the time of his encounter with Silva, Price was a sworn Gwinnett County police officer.

_____

detective's status but whether the defendant's statements were the result of police questioning. *Id.* at 1249.

23

(2) He was dressed in his official uniform and operating his official patrol vehicle.

(3) He had assisted the federal agents in the execution of a search warrant related to the charges contained in the pending indictment.

(4) He had arrested Silva in August 2009 on the present charges.

(5) He had conversations with others in the community, particularly gang members, about Silva's activities.

(6) His position as a surveillance officer in Silva's subdivision was due to his position as a Gwinnett County police officer.

(7) He asked Silva about the status of his pending case.

(8) He did not express any non-law enforcement reason for asking Silva about the status of his case.

(9) He disclosed to Silva that he (Price) had spoken to gang members in the community about Silva's activities.

(10) Price attempted to recruit Silva to cooperate with law enforcement, telling him he was "involved in a lot of things" and recognizing that any cooperation by Silva likely would be with the federal authorities who had charged him.

24

(11) Price immediately called Blevins and reported the substance of his conversation with Silva.

(12) Price reminded Silva that he needed to bring his vehicle into compliance with a proper license plate.

These facts demonstrate that Price was acting as law enforcement officer when he had the February 12 encounter with Silva.

Next, the Court must consider whether Price deliberately elicited any of the statements from Silva which the government seeks to use at trial.  In order to prove this factor, Silva "must demonstrate that the police . . . took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann*, 477 U.S. at 459.

Silva argues that the test for deliberately eliciting a statement focuses on the perceptions of the defendant. The Court rejects this standard because it is directly contrary to the above-quoted language from *Kulhmann*, where the Supreme Court stated that the test is police action designed to deliberately elicit an incriminating statement from the defendant. *Id.*

The government argues that in order to determine whether statements were deliberately elicited from Silva by Price, the Court must look to Price's subjective

25

intention.  The case law provides no clear guidance as to whether the government is correct.  *Compare Torres v. Dennehy*, 615 F.3d 1, 6 (1st Cir. 2010) ("The equating of deliberate elicitation with 'purpose' in *Fellers* pretty clearly suggests a concern with subjective intent of the officers."); *United States v. Criswell*, 696 F.2d 636, 639 (8th Cir. 1982) ("To determine whether the authorities 'deliberately elicited' a statement, courts look primarily to the intent of the police.") (footnote omitted), *with United States v. Harris*, 738 F.2d 1068, 1971 (9th Cir. 1984) ("*Henry* establishes that the determinative issue is not the informant's subjective intentions, but rather whether the federal law enforcement officials created a situation which would likely cause the defendant to make incriminating statements."); *Cannistraci v. Smith*, 470 F. Supp. 586, 593 (S.D.N.Y.  1979) (noting that "[d]eliberate elicitation can be demonstrated with either subjective proof of intent on the part of the police or objective proof relating to police conduct" but stating that "[i]t would, of course, be unwise to place too great weight on the refusal of a police officer to admit that his questions were designed to pressure a defendant into incriminating himself [and t]herefore, the court must look to the objective evidence and ask whether the officer's conduct might reasonably have been expected to result in the utterance of an incriminating statement.").

26

The Court agrees with the government that whether a statement is "deliberately elicited" from a counseled defendant is governed by a subjective standard.  First, the Court finds the First Circuit's reasoning in *Torres* and the Eighth Circuit's reasoning in *Criswell* sound.   Second, the Supreme Court's use of the phrase "designed deliberately to elicit incriminating remarks," *Kuhlmann*, 477 U.S. at 459, denotes a subjective standard.  *See, e.g., United States v. Bender*, 221 F.3d 265, 268-69 (1st Cir. 2000)   (Sixth Amendment violation when undercover government agent initiated conversation with defendant about unrelated crimes because state must have known agent likely to obtain incriminating statements from accused).

Applying a subjective analysis, the Court concludes that Price deliberately elicited incriminating statement from Silva.  First, the Court rejects the government's contention that Silva's approach of Price and initiation of the conversation is determinative.  The Supreme Court has held that the identity of the party who instigated the meeting at which the government obtained incriminating statements was not decisive or even important.  *Moulton*, 474 U.S. at 174.  *Compare United States v. Gonzalez*, 183 F.3d 1315, 1324 (11th Cir. 1999) (no Sixth Amendment violation when defendant initiated incriminating conversation with police).  On the other hand, while

27

Silva initially approached Price, the conversation was distinctly composed of small talk until Price stated that Silva was out of jail and asked about his case.

Second, the question posed by Price was one designed to deliberately elicit an incriminating response. The government argues that Price's question was prompted by his seeing Silva unexpectedly out of jail, but Silva told him he was released on bond by the time Price asked about the status of the case. Nor was the question directed towards determining whether the case was "on-going or had been resolved in some way," [Doc. 286 at 12], since release of a defendant on bond generally means the case is still pending. Of course, if Price's lack of knowledge about the case's pendency was what prompted his question, Price could have asked Silva simply whether the case was still on-going or whether it had concluded.

The government also argues that if Price had intended to obtain incriminating responses, he would have followed up with Silva by asking pointed questions about the evidence against him, the number of wiretaps he was on, etc. The Court also rejects this argument, because immediately after Silva responded to the question about the status of the case, Price told Silva about the information he received from a gang member and then sought Silva's cooperation. In fact, therefore, Price's follow-up statements were fairly accusatory.

28

This is not a case where the defendant's statements were obtained by "luck or happenstance." *Moulton*, 474 U.S. at 176; *see, e.g., Bey v. Morton*, 124 F.3d 524, 531 (3d Cir. 1997) (no Sixth Amendment violation where prisoner casually conversed with prison guard who did not intend to elicit information from prisoner); *Valdez v. Ward*, 219 F.3d 1222, 1235 (10th Cir. 2000) (no Sixth Amendment violation when police initiated questioning about defendant's immigration status and defendant made spontaneous, unsolicited remarks about murder charges). Price's questioning turned the conversation towards a discussion of Silva's case. *See Terzado*, 897 F.2d at 1109 ("The Supreme Court made clear in *Henry* that the government violates a defendant's Sixth Amendment right '[b]y intentionally creating a situation likely to induce [an accused] to make incriminating statements without the assistance of counsel.' " (quoting *Henry*, 447 U.S. at 274). When, as here, a police officer does more than just listen, but also initiates discussion of the case which leads to incriminating statements, a Sixth Amendment violation occurs. *United States v. Johnson*, 954 F.2d 1015 (5th Cir. 1992). Price followed up his question by telling Silva that he had discussed his (Silva's) activities with a gang member who knew him, and then attempted get Silva to cooperate with either local or federal law enforcement. Finally, when the encounter was over, Price reported his conversation with Silva to the DEA agent in Silva's case.

29

These facts demonstrate Price's subjective intent to deliberately elicit incriminating statements from Silva. As a result, Silva has satisfied his burden as to the second prong of a Sixth Amendment right to counsel violation.

Therefore, the undersigned **RECOMMENDS** that the defendant's motion to suppress statements, [Doc. 244], be **GRANTED**.

### *Conclusion*

For the reasons discussed above, the undersigned **RECOMMENDS** that the defendant's motion to suppress statements, [Doc. 244], be **GRANTED**. The Court has now ruled on all pretrial motions filed by this defendant. Accordingly, the case as to Defendant Silva is **CERTIFIED READY FOR TRIAL**.[7]

---

[7]     As matters pending to Defendant's co-Defendants still are pending, Defendant's case need not be placed on the trial calendar at this time. 18 U.S.C. § 3161(h)(6).

30

**IT IS SO RECOMMENDED AND CERTIFIED**, this the __1st__ day of November, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

31